547 So.2d 1106 (1989)
Kuzma D. TESVICH
v.
3-A'S TOWING CO. Consolidated With
Sinajka FARAC, M.J. Farac, Jr., and Beatrice Farac
v.
3-A'S TOWING CO., et al.
Nos. CA-8849, CA-8850.
Court of Appeal of Louisiana, Fourth Circuit.
July 13, 1989.
Rehearings Denied September 12, 1989.
*1107 David J. Hebert, Marrero, and Anthony D. Ragusa, Jr., Port Sulphur, for Sinajka Farac, Jr., Beatrice Farac and Kuzma Tesvich.
Norman C. Sullivan, Jr., Randall C. Coleman, III, New Orleans, and J.Y. Gilmore, Jr., New Orleans, for John Hebert Barder, Individually and on Behalf of Certain Underwriters at Lloyd's and other British Companies.
Before SCHOTT, C.J., and BARRY, KLEES, CIACCIO and WILLIAMS, JJ.
*1108 SCHOTT, Chief Judge.
Plaintiffs are oyster fishermen who hold leases from the state for oyster production on 378 acres of water bottoms in Bay Lanaux in Plaquemines Parish. On September 25, 1980, the tugboat, John XXIII, entered the bay with a barge in tow and became grounded after traversing the bay. Later, the tugboat's owner dispatched a second tugboat, the Nora Adams, to free the first tug. Plaintiffs claimed damages to their leases and loss of profits from the actions of the two tugboats. Defendants are certain underwriters at Lloyds who insured the vessels. The trial court found that both vessels destroyed the oyster beds and awarded judgments to the plaintiffs against the underwriters totaling $4,724,601.00. ($1,791,368 for Sinajka and Beatrice Farac, $684,622.50 for M.J. Farac, Jr., $1,502,910.50 for Beatrice Farac, and $745,700 for Kuzma Tesvich) The underwriters have appealed. The principal issues concern the quantum of damages and the extent of insurance coverage.
There is no question but that the John XXIII caused damage to plaintiffs' oyster beds. There is some question whether some additional damage was done by the Nora Adams. The primary question is the extent of the damage. Shortly after the incident, plaintiffs filed a complaint with the Louisiana Department of Wildlife & Fisheries who dispatched biologist Robert E. Ancelet to investigate the matter. He testified that 116 acres were directly damaged when the vessel or vessels traversed the oyster beds. He based this conclusion on gouges, depressions, trenches, and mounds he found in and around the leases. He also found evidence of some damage outside of the directly affected area from sediment which was plowed and spread over the bay by the vessel(s).
Plaintiffs, Tesvich and M.J. Farac, Jr., both testified that the entire 378 acres of oyster beds in the bay were ruined. Tesvich put it quite simply, "because the bottom is so soft, it can't support no oysters." Farac stated that he and his family have planted seed oysters on the leases since the damage was done and the oysters became buried under the sediment. He said they abandoned the area because it would not pay to work the leases for oysters unless the bottom was rebuilt.
In June, 1985 Dr. Edwin Cake, a marine biologist, investigated the oyster situation in the bay at the request of the plaintiffs. He concluded that the entire bay had been rendered unsuitable for commercial oyster production because of the damage caused by the offending vessel(s). He based his conclusion on samples he took showing fine sediment spread throughout the bay except around the perimeter and the absence of live oysters throughout the bay except on elevated reefs. He recommended that the entire bay bottom be covered with shells in order to provide a suitable surface for oysters to grow and reproduce. Thus, he supported the conclusion that the entire 378 acres which were under lease to the plaintiffs would have to be repaired.
The underwriters produced a biologist who testified that the damage was not nearly as extensive. Based on his investigation in October, 1980 he concluded that only 61 acres were directly damaged and he disputed Dr. Cake's theory that there was any damage to the leases beyond the paths of the vessel(s).
In extensive reasons for judgment the trial court found that the entire area leased to plaintiffs was rendered unsuitable for oyster production and that plaintiffs were entitled to restoration or reconstruction of the entire 378 acres. Restoration would consist of spreading shells on the leased water bottoms to the extent of fifty cubic yards of shells per acre at a cost of $16.59 per yard. The court awarded reconstruction amounts to each plaintiff (for purposes of discussion plaintiffs Sinajka and Beatrice Farac in their joint claim will be sometimes referred to as a single plaintiff) based on the formula of the number of acres leased times fifty times $16.59 with this result:

S & B Farac 144 acres Ũ 829.50 = $119,448.00
M.J. Farac 55 acres Ũ 829.50 = 45,622.50
Beatrice Farac 119 acres Ũ 829.50 = 98,710.50
Kuzma Tesvich 60 acres Ũ 829.50 = 49,770.00

The trial court also found that the plaintiffs were entitled to profits they would lose for ten years from the time the damage was inflicted to their leases. The court *1109 based this conclusion on finding that once the oyster beds were reconstructed commercial production could not resume until three years later and on a holding that plaintiffs were already entitled to seven years of lost profits by the time of the trial in 1987 because the defendants had failed to "mitigate" their damages by paying for the reconstruction as soon as the damage occurred. The court found that these oyster beds would yield one hundred sacks of oysters per acre per year and awarded lost profits for each year based on the formula: Number of acres Ũ 100 sacks Ũ price per sack.
In this court the underwriters strenuously dispute the conclusions that all 378 acres were destroyed for oyster production and required reconstruction, that plaintiffs are entitled to any lost profits beyond two years, and that plaintiffs are entitled to recover the price of the oysters (for lost profits computation) without regard to the expenses incurred in bringing the oysters to market.
We have reviewed the judgment of the trial court in the light of those fundamental principles which provide that factual findings and conclusions of the trial court will not be disturbed in the absence of manifest error and an award for damage by the trial court will not be disturbed unless it constitutes an abuse of the great discretion vested in the trial court for this purpose. We have also applied the principle that a conclusion on the appellate level that an award is excessive will supply a basis of reducing the award only to the highest level or limit of the trial court's discretion. Thus, in analyzing the present judgment we have resolved to leave intact as many of the trial court's conclusions as the record supports, but we have nevertheless concluded that substantial modifications and reductions in the judgment are warranted.
The court's conclusion that the entire leased area was damaged and requires reconstruction is essentially a factual one based upon the combined testimony of the plaintiffs and of Ancelet and Cake. As to the plaintiffs it was the function of the trial court to assess their credibility. That there was some damage from outside of the area directly invaded by the vessel(s) is supported by Ancelet's testimony. In attacking Cake's conclusion that the entire bottom of the bay had to be repaired to make the entire bay suitable for commercial production defendants argue that he didn't take enough samples and that the presence of some live oysters in the samples he took disproved his theory. But Cake testified that the live, marketable oysters were found for the most part only around the perimeter of the bay and on high points of reef.
He explained that the more practical solution was to reshell the entire bottom rather than to stake out the tops of the old reef and to determine where to spread new shells. He stated, "In my estimation, the sediments that were moved about in that bay were sufficient to interfere with oyster culture throughout the bay except for the very margins of the bay." He insisted that the entire leased area should be reshelled. Dr. Cake based his conclusions on a legitimate investigation and he explained it logically and clearly. His testimony confirmed what the plaintiff said and was consistent with Ancelet's. Even though the defendants' expert disputed Cake's conclusions and offered good reasons for his position the trial court resolved this conflict in Cake's favor. On the appellate level we accept this resolution.
There is no real dispute as to the cost of such a restoration. The evidence established that the work would consist of spreading fifty cubic yards of shells per acre and the cost would be $16.59 per yard. Consequently, the plaintiffs are entitled to recover $829.50 per acre for reconstruction as the trial court awarded.
We have concluded that the awards for loss of profits are excessive. They are based upon an error of law which led the trial court to award ten years of lost profits. Furthermore, they are factually erroneous because they do not comport with the testimony of plaintiffs themselves that they never did and never would fish the full potential of oyster production from these leases in a given year or in successive years. Finally, the awards are inconsistent with this court's expressions in Skansi v. Signal Petroleum, 375 So.2d 965 (La.App. 4th Cir.1979).
*1110 In awarding plaintiffs ten years of lost profits, the trial judge reasoned that plaintiffs already lost seven years of production by the time of the judgment and would lose an additional three years from the time the repair work was done. He spoke of the defendants' duty to "mitigate" their damages by making the repairs pending this litigation. The law does not support such a result. Defendants disputed plaintiffs' claim and they were entitled to do so. Until the court would hold that they were liable for this restoration cost and the judgment became final the defendants were under no obligation to pay this amount. It is plaintiffs who were required to mitigate their damages by doing the repair work and restoring full oyster production as soon as possible. This is why they are entitled to interest on the restoration cost from date of judicial demand. Since the evidence fairly establishes that the beds would not yield a full harvest until three years after the beds were restored plaintiffs are entitled to the loss of production for only three years, 1981-1983.
In computing lost profits for these years the trial judge made these findings: ".... that the average yearly harvest per acre in the Bay Lanaux area was one hundred (100) sacks per acre for each Lease" and "that the value of a sack of oysters for the year 1981 was $8.00 .... [and] .... for the year 1982 through 1984 the value of a sack of oysters was $10.00." For each plaintiff he multiplied the total acres leased times the 100 sacks times the price and awarded the product for each year.
The flaw in this reasoning is the manifestly erroneous finding that they would harvest the full potential each year. This finding is negated by the testimony of the plaintiffs themselves. Tesvich and M.J. Farac, Jr. both analogized oyster fishing to raising crops on a farm. They spoke of rotating their beds and made it clear that they do not harvest a bed's full potential in successive years. Tesvich testified that he owned his two leases containing a total of sixty acres in the bay since 1978 but had not harvested the first oyster from there even though oysters were available. He stated that he harvested his oysters in 1978 from some state leases and in 1980 from a lease of 48 acres he held on Meyers Canal. He said that he intended to harvest oysters from his Bay Lanaux leases in March 1981 but could not because of the damage inflicted to the beds in September, 1980. Farac testified that he and his family had 5000 acres of oyster leases and it was impossible for them to work all of these beds so that they rotated their beds every two or three years.
In addition, Farac testified that his family harvested 20,000 to 25,000 sacks of oysters in each of the years 1978 and 1979 and that sixty percent of their production came from Bay Lanaux or from 12,000 to 15,000 sacks. They held 318 acres of leases in the bay so that they had the potential of harvesting 31,800 sacks in each of these years based on the given figure of 100 sacks per year. Thus, the Faracs harvested a maximum of 47% of the potential in each of two years before the tort.
In discussing the measure of recovery for damaged oyster beds where the plaintiffs had access to undamaged beds this court held that income from undamaged property would not "in and of itself relieve the tortfeasors from paying plaintiff's full loss of use of the asset they damaged, unless it appears that both properties, if undamaged, more likely than not would not have produced profits during this period." Skansi at p. 968. Since the evidence clearly preponderates to the effect that neither Tesvich nor the Faracs would have harvested the full potential for all three years the judgment of the trial court allowing full recovery is clearly wrong and constitutes an abuse of discretion.
For the Faracs, the measure of recovery is 47% of their potential, based on the testimony of M.J. Farac, Jr. For Tesvich, we accept his testimony as the trial court did that he was going to work his leases in Bay Lanaux for the first time in 1981 and allow him full recovery for that year. However, based upon his and M.J. Farac's testimony we disallow recovery for 1982 and allow full recovery for 1983.
The trial court computed loss of production by the price at which the oysters could be sold without any deduction for the expense of harvesting them. This conclusion *1111 is clearly wrong. There was little dispute that the price plaintiffs could have gotten for oysters in 1981 was $8 per sack and in 1982 and 1983, $10 per sack. There was a sharp conflict over the cost of harvesting the oysters. One of the plaintiffs offered testimony that his costs were as high as $5 per sack in some locations, but he testified that the accessibility of Bay Lanaux made the cost as little as $1.50 per sack. Defendants offered the testimony of an accountant to show that production expenses approached 90% of the price based on an analysis of the expenses reported on income tax returns for the operation of the oyster boats. From this and other conflicting testimony we have concluded that the cost of harvesting oysters from these particular leases from 1981-1983 would have been $3 per sack.
Accordingly, we have concluded that each plaintiff is entitled to the amounts set forth below for lost profits. Lost profits are based on 100 sacks per acre per year and the amounts of $5 and $7 per sack are based upon the price of $8 per sack in 1981 and $10 per sack in 1982 and 1983 less expenses of $3 per sack.
The Faracs' recovery is limited to 47% for each year and Tesvich's recovery is limited to 1981 and 1983. Hence:

SINAJKA and BEATRICE FARAC:
1981 144 acres Ũ 100 Ũ .47 Ũ $5 = $ 33,840.00
1982 144 acres Ũ 100 Ũ .47 Ũ 7 = 47,376.00
1983 144 acres Ũ 100 Ũ .47 Ũ 7 = 47,376.00
 ___________
 Total of Lost Profits $128,592.00
M.J. FARAC, JR.:
1981 55 acres Ũ 100 Ũ $5 Ũ .47 = $ 12,925.00
1982 55 acres Ũ 100 Ũ 7 Ũ .47 = 18,095.00
1983 55 acres Ũ 100 Ũ 7 Ũ .47 = 18,095.00
 ___________
 Total of Lost Profits $ 49,115.00
BEATRICE FARAC:
1981 119 acres Ũ 100 Ũ $5 Ũ .47 = $ 27,965.00
1982 119 acres Ũ 100 Ũ 7 Ũ .47 = 39,151.00
1983 119 acres Ũ 100 Ũ 7 Ũ .47 = 39,151,00
 ___________
 Total of Lost Profits $106,267.00
KUZMA D. TESVICH:
1981 60 acres Ũ 100 Ũ $5 = $ 30,000.00
1933 60 acres Ũ 100 Ũ 7 = 42,000.00
 ___________
 Total of Lost Profits $ 72,000.00

The underwriters have raised a number of insurance questions which must be addressed. The first requires an interpretation of the policy which limits recovery to $500,000 for each occurrence. The trial court found that there were eight occurrences because there were four plaintiffs and each vessel contributed damage to all of the leases. We are satisfied that virtually all the damage was done by the John XXIII so that if all claims constituted a single occurrence the liability of the defendants would be limited to $500,000 instead of the $669,525 of damages we award to the plaintiffs. However, we have concluded on the basis of Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1973) that the claim of each plaintiff with respect to his or her leases constitutes a separate occurrence.
The trial court denied the underwriters the right to limit their liability to the value of the vessel and freight then pending pursuant to 46 U.S.C.App. Section 183 because the defendants failed to prove 1) the value of the vessel at the time of the incident; 2) that the owners of the vessel were without privity or knowledge of the actions of the vessel; and 3) that the defense was not barred by laches. The underwriters contest these findings. After reviewing the evidence, we find the underwriters are not entitled to limit their liability because they failed to prove the value of the freight then pending, one of the elements of the 46 U.S.C.App. Section 183 defense. This holding obviates any discussions about privity or laches.
Defendants proffered the testimony of a marine surveyor, James Latham, who had valued the John XXIII on August 6, 1980 at $150,000.00. Additionally, he testified that at the time of the accident, two months after his appraisal, the value of the vessel would not have changed. Defendants also proffered the testimony of Harold Adams, the vice-president of the vessel's owner. He testified that his company paid $900.00 for the John XXIII to make the two day voyage from Venice, Louisiana *1112 to Lake Washington, but he did not testify nor did any other witness testify as to the value of the freight then pending. As the 46 U.S.C.App. Section 183 defense requires that the party attempting to limit their liability prove both the value of the vessel and the freight then pending, the underwriters' failure to prove this element precludes the defense.
Defendants claim the trial court erred in holding the individual underwriters liable, in solido, to plaintiffs. Rather, defendants claim each underwriter's liability should be limited to that portion of the loss subscribed to by the individual underwriter. This position is correct. Prior to July 1, 1988, Louisiana's insurance code permitted individual underwriters at Lloyd's to limit their liability to the proportionate part of the loss fixed in the contract of insurance. LSA-R.S. 22:499, as amended and reenacted by Acts 1958, No. 125. Therefore, the liability of each underwriter will be limited to the portion of the loss to which he subscribed.
The underwriters contend that the trial court's award of interest from date of judicial demand is improper because the plaintiffs delayed the prosecution of the case and the damages were not ascertainable until trial. LSA-R.S. 13:4203 provides that interest in tort cases runs from the date of judicial demand. Therefore, this argument has no merit.
The underwriter's final specification is that the trial court erred in setting the amount of Dr. Cake's expert witness fees at $3,000.00 because it was six times the amount set for the other expert witnesses who testified at trial. Fixing compensation of expert witnesses is, by statute, the right of the trial judge, LSA-R.S. 13:3666. To alter an award of expert witness fees, an appellate court must find that the trial judge abused the great discretion accorded to him in such matters. Wetzka v. Big Three Industries, Inc., 409 So.2d 393 (La. App. 4th Cir.1982). Thus, even though Dr. Cake's fee is considerably higher than the fees set for the other expert witnesses who testified at trial, based upon Dr. Cake's credentials and his preparation for trial, we cannot conclude the trial court abused its much discretion in fixing the fee. Oshinski v. Central Nat. Ins. Co. of Omaha, 432 So.2d 929 (La.App. 4th Cir.1983), writ den., 440 So.2d 148 (La.1983).
Accordingly, the judgment appealed from is amended to reduce the awards to the following amounts:

In favor of Sinajka and Beatrice Farac: $248,040.00
 M.J. Farac, Jr. 94,737.50
 Beatrice Farac 204,977.50
 Kuzma D. Tesvich 121,770.00

The judgment is further amended to delete several and solidary liability among the underwriters and to limit their individual liability to that portion of the liability subscribed to by each underwriter.
In all other respects the judgment appealed from is affirmed.
AMENDED; AFFIRMED.
Barry, J., dissents in part.
Williams, J., concurs in part and dissents in part.
BARRY, Judge, dissents in part.
I endorse the majority's well-reasoned conclusions except as to the time period for lost profits.
The damage to the bay's bottom was extensive. The amount of sediment and debris would require a long period of time to settle before the bottom firmed up. Only then could shells be deposited to form the necessary foundation for oyster growth.
It is accepted that three years are required for a seeded bed to be fully productive. The majority errs by simply assuming the bottom would be immediately suitable to receive the shells, assumes the project would begin immediately, then assumes the project can be accomplished in a matter of days.
Three years for lost profits ignores reality. I would remand for a resolution of the time frame and award damages accordingly.
WILLIAMS, Judge, concurs in part and dissents in part.
I respectfully dissent from the panel majority's conclusions that there is evidence *1113 on record supporting that 378 acres of oyster leases sustained damage, that plaintiffs proved and are entitled to recover damages for lost profits, and that multiple "occurrences" occurred within the meaning of the insurance policy.
First, the evidence proving the extent of acres damaged shows that only 116-120 acres, and not 378 acres, were damaged. Plaintiffs' initial expert, Ancelet, testified that his investigation showed a total of 116 acres of oyster leases were damaged. Plaintiffs second expert, Cake, who did not visit Bay Lanaux until five years after the crossing incident, adopted these findings in toto. Hence, the lengthy report Cake prepared for trial discussed only the damaged 116 acres without a hint that 378 acres were damaged. At trial, however, Cake clouded the damaged acreage issue by speaking hypothetically about the entire bay being damaged by sedimentation as a result of the M/V John XXIII's crossing. But as Cake had not taken any coring or current samples and had not even taken dredging samples from all seven of plaintiffs' leases, much less the entire bay, his remarks about sedimentation destroying the oyster production of the bay were based upon unscientific conjecture and not upon facts. Moreover, that Cake was testifying hypothetically, and not factually, did NOT go unnoticed by the trial court. After the close of plaintiffs' presentation of their case when defendants were attempting to rebut the effects of Cake's hypothetical statements with the testimony of their own expert (Rayle), Judge Martin informed defense counsel that the rebutal evidence was unnecessary because:
THE COURT:
... I also understand that this witness [Rayle] has testified that certain areas of the lease were not disturbed. I think the contents of both of [Cake and Rayle's] testimony is to the effect that there were some areas that were not disturbed and I don't think anybody is contending that the entire reefs were disturbed or gouged or covered with sediment.

(tr. transcript, pp. 573-574.)
Thus, in the context of the evidence actually presented and Judge Martin's remarks, I find it inconceivable and irrational that both the trial court and the panel majority can find that an iota of evidence supports the conclusion that the entire 378 acres of the plaintiffs' oyster leases sustained damages as a result of the M/V John XXIII's crossing.
Next, on the issue of lost profits, there are two determinative flaws with the panel majority's award of damages. First, the panel has allowed the plaintiffs double recovery by not limiting their lost profits to the difference between the profits actually obtained from fishing oyster reefs in 1981-1983 and the additional profits they could have obtained from fishing their Bay Lanaux leases. To illustrate this point, consider the following: Tesvich is his own captain and he owns only a single boat. His operation consists mainly of his own labor. Tesvich fished oysters during 1981-1983 and received profits from the oyster reefs he worked during that period; he was not idle. Physically, he could not have worked both his Bay Lanaux leases and the reefs he actually worked. Consequently, any award of lost profits to Tesvich must reflect the limitation of his own labors, i.e. that he could not have been fishing two reefs at a single point in time. Thus, it was error to award damages for lost profits that did not reflect the difference between what he would have received from working his Bay Lanaux leases from that which he actually worked. Likewise, the Faracs could not have had their fleet(s) in two places at one time. As the Faracs did not show that their fleets were unused as a result of the M/V John XXIII's crossing, any award of lost profits to the Faracs should also be limited to the difference between the profits actually obtained from fishing their other leases and the additional profit they could have obtained from fishing their Bay Lanaux leases.
Second, because the plaintiffs failed to prove their costs, a factor essential to proving their claim of lost profits, they are precluded as a matter of law from recovering damages for lost profits. To obscure the issue, at trial the Faracs limited their *1114 proof of lost profits to evidence which showed only their projected gross profits. Yet on the stand, Farac admitted he had evidence which could prove his costs. Nevertheless, he made no attempt to show his costs because that evidence would have had the concurrent effect of placing a cap on the amount he could recover. Farac gambled, considering his chances of obtaining a higher lost profit award were greater if award-restricting evidence was not introduced. Accordingly, the only evidence on plaintiffs' costs was that which was produced by defendants in an effort to rebut plaintiffs' claims that they were entitled to gross profits. However, as it is the rule in this Circuit that lost profits are precluded where corroborative evidence is shown to be available but is not produced, F & F Transfer, Inc. v. Tardo, 425 So.2d 874 (La. App. 4th Cir.1983), plaintiffs are not entitled to lost profit damages and the panel majority grossly erred in not finding the Faracs were precluded from recovering lost profits.
Additionally, I believe it is manifestly unjust and contrary to fundamental fairness for the panel majority to establish the plaintiffs' production expenses with evidence that defendants presented after the close of plaintiffs' case-in-chief. Both the testimony of the accountant and plaintiffs' income tax records were presented by defendants and not by plaintiffs. This evidence should not be used to prove plaintiffs' damage award.
Finally, I believe that both the trial court and the panel majority erred as a matter of law in finding that under the rule of Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1973), the stranding and freeing of the M/V John XXIII constituted separate occurrences within the meaning of the insurance policy. The multiple causes present in Lombard are not analogical to the brief, continuous and single cause event of the M/V John XXIII's crossing of Bay Lanaux. Without either a combination or a series of damage causing circumstances, or the passage of a substantial period of time (Lombard involved a year-long, multiple-cause activity), the rule of Lombard dictates that only a single "occurrence" transpired when the M/V John XXIII crossed plaintiffs' leases.
However, because the panel majority is inclined to augment the local plaintiffs' recovery by increasing the maximum of the underwriters' exposure, the majority has distorted the rule of Lombard. Hereafter, a simple fire within a single building or a run-of-the-mill automobile accident could in some instances be a single occurrence, while in other instances be multiple occurrences depending upon boundary line locations, the numbers of objects involved or the number of plaintiffs asserting claims. The anticipated effect of this distorted interpretation will be dramatically increased insurance premiums to compensate for insurer's unanticipated increase in liability exposure. This twisting and warping of Lombard's rule is, quite simply, an injustice. In my opinion, the courts of this state are obliged to impartially apply rules of lawâ even if the defendant is an out-of-state insurance company or business. In the long run, this form of favoritism hurts the people of Louisiana as it serves to drive foreign business enterprises away from our State.
This court has erred in its application of Lombard to the brief, continuous and single-cause event of the M/V John XXIII's crossing of Bay Lanaux. Under the facts and the terms of the policy, Lombard dictates that only a single occurrence transpired so that the maximum exposure for which the defendant underwriters are liable is $500,000.00, the policy's coverage limit per single occurrence.
For the reasons assigned, I believe the panel majority erred in issuing its opinion. Moreover, I believe the opinion and judgment that the panel should have adopted is as follows:
This appeal brought by defendant, John Herbert Barder individually and on behalf of certain underwriters at Lloyd's and other British companies, concerns a claim for damages stemming from the stranding and freeing of the push boat the M/V John XXIII, after the vessel traversed and then became grounded upon certain oyster leases *1115 in the Bay Lanaux area. After a bench trial, an award of $4,724,601.00, together with legal interest from date of judicial demand, was rendered in favor of the four plaintiffs and against the Lloyd's Plan Underwriters, in solido, for the damages caused to the plaintiffs' seven oyster leases by both the push boat and its rescue vessel.
The arguments advanced on appeal assert that the trial court erred 1) by finding defendants liable for the rescue efforts of the M/V Nora Adams; 2) in characterizing, for purposes of determining coverage limitations, the number of separate "occurrences" involved in the stranding and freeing incident by the number of oyster leases traversed; 3) by finding plaintiffs proved their damages; 4) by awarding damages equivalent to ten years of lost gross profits; 5) by finding the plaintiffs are entitled to reconstruction costs; 6) in holding the underwriters solidarily liable for the full amount of the judgment; 7) in denying the underwriters the right to limit their liability, pursuant to 46 U.S.C. App. Section 183, to the value of the vessel(s) and freight; 8) by determining the entire water bottom of Bay Lanaux had been damaged; 9) in awarding plaintiffs interest running from the date judicial demand was made against 3-A's Towing; and 10) in awarding expert witness fees in the amount of $3,000.00 to estuarian biologist, Dr. Cake. For the reasons assigned, we find that the trial court acted properly in denying the underwriters the right to limit their liability pursuant to the 46 U.S.C. App. Section 183; awarding interest from date of judicial demand; determining that plaintiffs are entitled to reconstruction cost; and setting Dr. Cake's expert witness fee. We, however, find that the lower court clearly erred in ruling that the defendants are liable as a result of the rescue efforts of the M/V Nora Adams; that the incident of the stranding and rescue of the M/V John XXIII consists of fourteen separate occurrences for the purpose of determining insurance coverage limitations; that the plaintiffs are entitled to lost gross profits for a decade; that the underwriters are solidarily liable; and that the whole of Bay Lanaux sustained damage as a result of the crossing and stranding of the M/V John XXIII. We also find that the Farac plaintiffs failed to prove their claim for lost profit damages, so that they are limited to reasonable damages for the lost use of their leases, and that Tesvich's claim for lost profits is limited to his proven crew costs and reasonable damages for the lost use of his leases.
Accordingly, the judgment of the court below is reversed in part, modified in part and affirmed in part.
FACTS
Under the operation of 3-A's Towing Company, the push boat M/V John XXIII and its Halliburton barge departed Venice, Louisiana enroute to Lake Washington. The vessels were not scheduled to cross Bay Lanaux; nevertheless, at approximately 6:30 a.m. on September 25, 1980, the vessels entered Bay Lanaux from the northwest. By 8:30 a.m., the vessels had traversed the length of the bay and had become grounded at its southeastern end, in the Grand Bayou area. While the barge floated, the push boat attempted to free itself, with the result that numerous mud lumps became visible above the shallow water in the area immediately surrounding the stranded vessel.[1]
Upon learning that the vessels were stranded, 3-A's Towing dispatched another vessel to perform rescue operations, the M/V Nora Adams, under the control of the company's vice-president. Arriving that evening from Grand Bayou, the M/V Nora Adams found the M/V John XXIII resting. In twenty minutes, the M/V Nora Adams assisted the barge out of Bay Lanaux. Within an additional forty minutes, she pulled the push boat out of the Bay and into Grand Bayou.
The Bay Lanaux area crossed by the M/V John XXIII, contains numerous oyster reefs owned by the State which are commercially leased by the Louisiana Department of Wildlife and Fisheries. Pertinent to this suit, seven oyster leases were crossed by the M/V John XXIII. Of these *1116 leases, Kuzma Tesvich owns two, Nos. 20651 (25 acres) and 22546 (35 acres), and the Farac family owns five, Nos. 2139 (106 acres), 21249 (23 acres), 22533 (55 acres), 22630 (15 acres), and 23853 (119 acres). It was upon Tesvich's lease No. 20651 that the M/V John XXIII became grounded.
Kuzma Tesvich entered the oyster business in 1978 when, for $55,000.00, he purchased from Robert Artigue 156 acres of oyster leases and a 40 foot boat fixed with two dredges, a winch and a cabin.[2] Artigue fished only as a hobby and Tesvich considered the oysters more plentiful on the State's wild reefs. Consequently, neither Artigue nor Tesvich had commercially harvested oysters from lease Nos. 20651 and 22546. Between 1978 and September 25, 1980, however, Tesvich carried 25 to 30 loads of oysters (350 sacks of oysters per load) from the State's wild reefs to his own reefs, so that he would have oysters to harvest when the State reefs closed. Tesvich testified that he had anticipated harvesting the oysters on lease Nos. 20651 and 22546 in March, 1981 and expected to reap 5,000 to 6,000 sacks of oysters from the two leases.
Tesvich, who is also a shrimper during the summer months,[3] testified that he sold his oysters for $7.00 a sack in 1980 and that he harvests oysters only when he has orders from customers. From these two operations, he produced business income of $15,851.00 in 1978; $10,209.00 in 1979; $15,595.00 in 1980; and $23,755.00 in 1981.
In contrast to Tesvich's one-man oyster business, the Farac family owns two fleets of oyster boats, 5,000 acres of oyster leases and three corporations. M.J. Farac, Jr., an oyster fisherman for 28 years, controls his own oyster leases as well as those owned by the other Farac plaintiffs, his mother, Beatrice, and his wife, Sinajka. The Faracs do not harvest all their leases every year. Instead, the 5,000 acres are rotated so that the oysters are allowed three to four years to become marketable size.[4] The Faracs work some of their oyster boats on shares, where the captain makes one-half and pays expenses, while on their other boats, the crew is paid by the day. Their estimated expenses run $150.00 to $200.00 a day.[5] The taxable income the Faracs realized from lease Nos. 21239, 21249, 22533, 22630 and 23853 was $7,199.00 in 1978; $36,814.00 in 1979; and $7,755.34 (loss) in 1980.[6]
In the weeks following the incident, 3-A's Towing sent surveyors from an environmental consultant firm, Steimle and Associates, to the Bay Lanaux area to evaluate the extent of the damage caused by the M/V John XXIII. Two of Steimle's biologists, Maureen Mulino and Michael Rayle, Jr., visited the area on October 23 and 24, 1980 so that they could track the course of the M/V John XXIII. By using a fathometer, sounding pole, map, compass and rangematic Mark V range finder, they determined the push boat's track was 120 to 256 feet wide, averaging 180 feet wide. They also determined the damage encompassed 61.4 acres. Their fathometer transect of lease No. 20651 revealed two separate tracks or independent gouges, covering approximately 15 acres. On lease No. 20651, they also viewed one to two foot mud lumps sticking out of the water.
At the plaintiffs' request, a biologist from the Louisiana Department of Wildlife *1117 and Fisheries, Robert B. Ancelet, also visited the area. To determine the amount of damage sustained by the leases, he made a half-day investigation of the area on November 7, 1980. He also returned to the area on November 20th to draw oyster samples. Using a fathometer, but not a sounding pole, he determined that the M/V John XXIII had taken a route different from the one tracked by the Steimle & Associate biologists. Additionally, he calculated that 116.3 acres of plaintiffs' leases sustained damage.
Prior to trial, plaintiffs hired an estuarian biologist, Dr. Edwin Cake, to examine the current status of the leases. Because he did not visit the Bay Lanaux area until June 2, 1985, nearly five years after the M/V John XXIII's crossing, Dr. Cake did not attempt to determine the extent of the damaged area. Instead, he adopted Ancelet's findings as to the number of acres damaged. However, using a sounding pole and a dredge, Dr. Cake determined that as of the time of his investigation, the support base of the reef was underneath sediment.
Following his visit to the bay area, Dr. Cake prepared a lengthy report on the status of the six leases he had surveyed.[7] This report also contained Dr. Cake's calculations on the plaintiffs' lost gross profits for the six years subsequent to the incident and the cost of reconstructing the 116.3 acres determined damaged by Ancelet. Because he had not made any tests, such as coring samples or water current samples, neither Dr. Cake's report nor his trial testimony contained findings as to the amount of sedimentation that resulted from the M/V John XXIII crossing Bay Lanaux.
PROCEDURAL HISTORY
On August 24, 1981, Kuzma Tesvich filed suit against 3-A's Towing, claiming $250,000.00 in damages and on September 22, 1981 the Faracs filed suit against 3-A's Towing and the Halliburton Company, claiming combined damages of $2,039,000.00. These suits were subsequently consolidated. Prior to trial, however, 3-A's Towing sought relief under Chapter 11.
Due to the stay order entered on October 17, 1983 by the United States Bankruptcy Court for the Eastern District of Louisiana, plaintiffs amended their petitions on January 16, 1985 and made defendants P-T Tugs, Inc. and certain underwriters at Lloyd's and other British Companies[8]. Simultaneously, plaintiffs motioned to sever 3-A's Towing from the proceedings. Thereafter, the underwriters attempted an unsuccessful removal action under federal court's diversity jurisdiction, claiming P-T Tugs[9] and the Halliburton Company[10] were nominal parties named to defeat the diversity jurisdiction of the federal courts. On plaintiffs' Motion to Dismiss and Remand, however, the consolidated suits were remanded to state court on May 18, 1985.
Thereafter, the underwriters amended their answers on June 6, 1986, invoking 46 U.S.C. App. Sections 183, 184, 185 and 188, in an attempt to limit their liability to the value of the vessel(s) and freight. Subsequently, plaintiffs filed a motion to sever P-T Tugs on August 11, 1986 and released all claims against the Halliburton Company on September 25, 1986.
The three day bench trial commenced on September 29, 1986. Thereafter, the court rendered judgment, without written reasons, on April 27, 1987 in favor of plaintiffs, awarding Sinajka Farac and Beatrice Farac $1,791,368.00; M.J. Farac, Jr. $684,622.50; Beatrice Farac $1,502,910.50; and Kuzma Tesvich $745,700.00, all together with legal interest thereon from date of judicial demand, and against defendants, John Herbert Barder, certain underwriters at Lloyd's and other British Companies, *1118 jointly, severally and in solido. The judgment also cast defendants with all costs of the proceedings, including expert witness fees of $3,000.00 for Dr. Cake and $500.00 each for all other experts who testified at trial.
The underwriters then filed a motion requesting written findings of fact and reasons for judgment, which the court issued on August 12, 1987. These writings indicate that the court found that the prop wash of the M/V John XXIII created a channel, causing the distribution of sediment over the entire Bay Lanaux area; the prop wash of the M/V Nora Adams also increased the channelization and agitation of silt which contributed to the distribution of silt throughout the entire Bay Lanaux area. The court found further that the oysters on plaintiffs' leases were killed and that the entire bay was rendered unsuitable for oyster production as a result of the sedimentation.
The plaintiffs' average annual harvest was determined to be one hundred (100) sacks of oysters per acre per lease. The oysters were valued at $8.00 a sack in 1981; $10.00 a sack in 1982 through 1984 and $13.00 a sack in 1985 through 1990. The court also found the leases would have to be repaired by the placing of clam shells on the water bottom. Further, as a result of the defendants' failure to mitigate their damages by their failure to repair the water bottoms, the court calculated plaintiffs' lost profit damages through the year 1990; the court's rationale being that if the oyster beds were repaired in the spring following the trial (1987), the leases would not be ready for harvest until 1991.
Defendants' limitation of liability defense was rejected. And the court found that because the defendants' insurance policy, with its "per occurrence" language, failed to define "accident" or "occurrence", the holding of Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1973) was controlling. Therefore, the damage to each lease was a separate occurrence and the actions of the M/V John XXIII and M/V Nora Adams triggered separate policy limits. As a consequence, the total combined insurance limits per oyster lease was $1,000,000.00.
On May 18, 1987, the underwriters timely filed a suspensive appeal and petitioned the trial court to consider that judicial interest against the underwriters should not commence prior to January 16, 1985, the date plaintiffs amended their petition and made judicial demand against them. This latter motion was either not acted upon or denied by implication.
MERITS
A. Separate Liability does not Flow From the Rescue Operations of the M/V Nora Adams
The underwriters assert that the trial court erred by finding them liable for damages flowing from the rescue efforts of the M/V Nora Adams. We agree. The record does not support the lower court's findings that the rescue efforts of the M/V Nora Adams "increased channelization and the agitation of the silt and bed deposits of Bay Lanaux and contributed to the distribution of the sediment and silt deposits throughout the entire Bay Lanaux area" and "caused damage to seven (7) separate leases".
The evidence introduced at trial showed that while freeing the M/V John XXIII and its barge, the M/V Nora Adams crossed only lease No. 20651 held by Kuzma Tesvich. Additionally, the expert testimony that was elicited indicated it was impossible to determine if the action of the M/V Nora Adams independently contributed to the damage of the oyster beds. The plaintiffs' expert, Dr. Edwin Cake, testified that there was no way to accurately determine the damage caused by the M/V John XXIII from the damage caused by the M/V Nora Adams. But, due to his conversations with the plaintiffs, he had no doubt that "both vessels could have caused damages on the leases."
The most compelling evidence on the issue, the fathometer transect of lease No. 20651 obtained by Steimle and Associates, revealed that the lease had two independent gouges in its water bottom. The biologists, however, could not determine if *1119 the two tracks were caused by one vessel in two locations or by two separate vessels.
Without competent evidence showing the rescue vessel caused damage either to lease No. 20651 or to plaintiffs' other leases, the trial court's finding that the M/V Nora Adams contributed to the damage of the oyster beds is without support. Accordingly, we find that the single cause of the damage sustained by the plaintiffs' oyster leases was the M/V John XXIII crossing Bay Lanaux and then becoming grounded upon lease No. 20651. Defendants, therefore, did not incur separate liability as a result of the rescue operations of the M/V Nora Adams on lease No. 20651.
B. The September 25, 1980 Stranding and Freeing of the M/V John XXIII is a Single Occurrence under the Terms of Policy No. HPO198A
Defendants specify that the trial court erred in determining that the damage to each of the plaintiffs' seven leases by the M/V John XXIII and/or the M/V Nora Adams, constituted separate "occurrences" within the meaning of the policy issued to 3-A's Towing. We agree.
Under the terms of Policy No. HP0198A, the marine protection and indemnity insurance policy issued to 3-A's Towing for the M/V John XXIII and the M/V Nora Adams, insurance coverage for each vessel was limited "in respect of any one accident or occurrence" to $500,000.00. Consequently, when characterizing the stranding incident to determine the amount of insurance coverage available to plaintiffs, the trial court applied the rule of Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1973) and held the damage caused to each of the seven leases traversed by the M/V John XXIII constituted seven separate occurrences, as did the damage caused to each of the seven leases by the rescue operations of the M/V Nora Adams, totalling fourteen separate occurrences. We, however, find the lower court misapplied Lombard. Under the facts of this case, the stranding and freeing of the M/V John XXIII constituted only a single "occurrence" within the meaning of the insurance policy as it involved a single, continuing and uninterrupted cause which spanned only a brief period of time.
Compare the facts of Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1983), to the facts of this case. Lombard involved seventeen suits, representing the claims of one hundred nineteen plaintiffs, for residential damage caused during the construction and installation of an underground drainage canal, a project spanning more than a year.
The Supreme Court in Lombard acknowledged that notwithstanding the precautions taken or the skills of the contractor, "it [was] relatively impossible to accomplish [that] type of [construction] work in a perfect manner." 284 So.2d at 908. Nevertheless, even though the City should have anticipated that the various construction activities such as pile driving, back hoe digging and dragline operating would have severe repercussions on the residential properties neighboring the construction site, the City procured only minimal insurance coverage. Both of the policies insuring the project limited coverage to $50,000.00 per occurrence and $100,000.00 aggregate, for operations conducted by the independent contractors.[11] Accordingly, when the damage occurred, defendants *1120 claimed the entire construction project fell within the definition of a single occurrence, so that the coverage limitation of $50,000.00 per policy was applicable.
Although defendants prevailed with this argument in the lower courts, the Supreme Court reversed, finding a separate occurrence transpired as to each plaintiff because each plaintiff's damages were sustained at different times during the prolonged project and were caused by a series of events or causes. Particularly, the court stated:
As a rational matter, however, it can hardly be said that this construction project lasting more than one year is a single "occurrence" within the contemplation of the quoted clause. Rather we think it is more logical to view this project as a series of "occurrences" resulting in damages during the course of this prolonged undertaking. The word "occurrence" as used in the policy must be construed from the point of view of the many persons whose property was damaged. As to each of these plaintiffs, the cumulated activities causing damage should be considered as one occurrence, though the circumstances causing damage consist of a continuous or repeated exposure to conditions resulting in damage arising out of such exposure. Thus, when the separate property of each plaintiff was damaged by a series of events, one occurrence was involved insofar as each property owner was concerned. Notwithstanding, therefore, that the same causes may have operated upon several properties at the same time resulting in varying degrees of damage, it cannot be regarded as one occurrence, but the damage to each plaintiff is a separate occurrence. Cf. Anchor Casualty Co. v. McCaleb, et al, 178 F.2d 322 (5th Cir.1950); Remmer v. Glens Falls Indemnity Co., 140 Cal.App.2d 84, 295 P.2d 19 (1956). (emphasis added) 284 So.2d 915-916.
The multiple causes present in Lombard, such as pile-driving and dragline operating during a year-long project which covered a four city-block area, is not analogical to the brief, continuous and single-cause event of the M/V John XXIII crossing Bay Lanaux on September 25, 1980. That morning the pushboat and its barge entered the Northwestern end of Bay Lanaux. By mid-morning, the push boat had traversed the length of the bay and then become grounded upon lease No. 20651, located at the southeastern end of the bay at Grand Bayou. After failing in its attempts to free itself, the push boat rested while waiting for the M/V Nora Adams[12] which arrived that evening during high tide. Within an hour of her arrival, rescue operations were completed, as it took twenty minutes to pull the barge and forty minutes to pull the push boat out into Grand Bayou.
Unlike the events described in Lombard, the track of the M/V John XXIII was not a planned project spanning a year with multiple and differentiated damage causing activities. Instead, the stranding of the M/V John XXIII involved a one day, off-course voyage and a single damage causing activity. A recap of the facts of the stranding incident describe an uninterrupted, continuous and single cause event which, unfortunately, impacted upon a number of oyster leases. However, without either a combination or a series of damage causing circumstances or the passage of a more substantial period of time than that described, under Lombard and the terms of the policy issued to 3-A's Towing, these facts represent that only a single "occurrence" transpired. Cf. McKeithen v. S.S. Frosta, 430 F.Supp. 899 (E.D.La.1977); Ducre v. Mine Safety Appliances Co., 645 F.Supp. 708, 1987 A.M.C. 2857 (E.D.La.1986), aff'd, 833 F.2d 588 (5th Cir.1987); Houston v. Avondale Shipyards, Inc., 506 So.2d 149 (La. App. 4th Cir.1987), writ den., 512 So.2d 459 (La.1987), reconsid. den., 513 So.2d 813 (La.1987).
The underwriters' liability for the fortuitous acts of the M/V John XXIII is dictated by the terms of Policy No. HPO198A. Thus, because the September 25, 1980 passage of the M/V John XXIII constitutes a single occurrence, the maximum exposure *1121 that the underwriters face is $500,000.00, the coverage limit per single occurrence.
C. Liability May Not be Limited to the Value of the Vessel and Freight
The trial court denied the underwriters the right to limit their liability to the value of the vessel and freight then pending pursuant to 46 U.S.C. App. Section 183[13] because the defendants failed to prove 1) the value of the vessel at the time of the incident; 2) the owners of the vessel were without privity or knowledge of the actions of the vessel; and 3) the defense was not barred by laches. The underwriters contest these findings and assert that they proved the value of the M/V John XXIII on September 25, 1980 was $150,000.00; the damages suffered by plaintiffs were incurred without the privity or knowledge of the management of 3-A's Towing; and the limitation of liability defense was not stale because the defense was unavailable to defendants prior to the United States Fifth Circuit's decision in Crown Zellerbach Corp. v. Ingram Industries, Inc., 783 F.2d 1296 (5th Cir.1986), cert. den., 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986). After reviewing the evidence, we find the underwriters are not entitled to limit their liability because they failed to prove the value of the freight then pending, one of the elements of the 46 U.S.C. App. Section 183 defense.[14]
On March 5, 1986, the Fifth Circuit Court of Appeals sitting en banc overruled its prior decision of Olympic Towing Corp. v. Nebel Towing Co., 419 F.2d 230 (5th Cir. 1969), cert. den., 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1969), which had denied vessel liability insurers the right to limit their liability to the value of the vessel and her freight then pending pursuant to 46 U.S.C. App. Section 183. Crown Zellerbach Corp. v. Ingram Industries, Inc., 783 F.2d 1296 (5th Cir.1986), cert. den., 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986); Cf. Schexnider v. McDermott Intern., Inc., 688 F.Supp. 234 (W.D.La.1988). The passing of Ingram Industries meant that the Section 183 defense was no longer personal to the vessel owner, so that the affirmative defense could also be asserted by a vessel's liability insurer. Accordingly, the underwriters amended their answer on June 6, 1986, to assert the 46 U.S.C. App. Section 183 defense.
As plaintiffs' objection as to relevancy was sustained, defendants proffered the testimony of the marine surveyor, James Latham, who had valuated the M/V John XXIII for 3-A's Towing on August 6, 1980.[15] Based upon an inspection conducted by two of his co-workers, Latham had placed the value of the M/V John XXIII, a 47 foot, six hundred horsepower push boat with a three level superstructure, at $150,000.00. Additionally, he testified that at the time of the accident, two months after his appraisal, the value of the vessel would not have changed.
The testimony of Harold Adams, the vice-president of 3-A's Towing, was also proffered.[16] Adams testified that 3-A's Towing was paid $900.00 for the M/V John XXIII to make the two day voyage from Venice, Louisiana to Lake Washington. He did not testify nor did any other witness testify as to the value of the freight then pending.
*1122 As the 46 U.S.C. App. Section 183 defense requires that the party attempting to limit their liability prove both the value of the vessel and the freight then pending, the underwriters' failure to prove this element precludes the defense. Therefore, irrespective of whether Latham's testimony sufficiently proved the value of the owner's interest in the vessel for the purposes of a limitation of liability defense, due to the lack of any evidence as to the value of the "freight then pending", the trial court correctly found the underwriters failed to prove their affirmative defense.
D. Solidary Liability of Lloyd's Plan Underwriters
Defendants claim the trial court erred in holding the individual underwriters liable, in solido, to plaintiffs for the $4,724,601.00 award. Rather, defendants claim each underwriter's liability should be limited to that portion of the loss subscribed to by the individual underwriter. We agree.
Prior to July 1, 1988, Louisiana's insurance code permitted individual underwriters at Lloyd's to limit their liability to the proportionate part of the loss fixed in the contract of insurance. LSA-R.S. 22:499, as amended and reenacted by Acts 1958, No. 125.[17] This was the law in effect at the time the trial court rendered judgment, as LSA-R.S. 22:499 then provided:
Individual Underwriter's liability
Each underwriter at a Lloyd's may limit his total liability by contract with the persons insured to the proportionate part of the loss represented by the ratio which his subscription paid-in, in cash and/or securities allowed by this Code, bears to the total assets contributed by the several underwriters and his total liability on all risks may be limited to the amount of his subscription as expressed in his power of attorney and agreement with the attorney-in-fact, provided that at least half of the subscription of each underwriter must be paid or contributed to the assets in cash and/or securities allowed by this Code. Each underwriter shall be responsible solely for his own liability as fixed in the contract of insurance and not be liable as a partner.
Thus, the individual underwriters who severally subscribed, each in respect to his or its individual portion only, to Policy No. HP0198A issued to 3-A's Towing Company, effective on or about December 20, 1979, have limited liability under (former) LSA-R.S. 22:499. Hence, when the trial court entered judgment on April 27, 1987, the court erred in finding the underwriters subscribing to Policy No. HP0198A liable in solido to the extent of the policy limits. Instead, the court should have limited the liability of the individual underwriters to the portion of the loss to which the individual underwriter had subscribed.
E. Damages
Defendants present five arguments supporting their claim that the plaintiffs' aggregate award of $4,724,601.00 has no basis in law or fact. Defendants claim the award is contrary to the law because the quantum is based upon 1) gross income, rather than net income; 2) lost profits for ten years; 3) an incorrect assessment of the extent of damage sustained by the leases; and 4) reconstruction costs. Defendants also claim that because the individual plaintiffs did not submit sufficient evidence to prove their damages, the amount awarded is not substantiated by the record.
1. Lost Profits Based Upon Gross Income
Initially, defendants contend that it was error for the trial court to award damages for lost profits because the award is based upon plaintiffs' projected gross income without reflecting any deductions for the expenses associated with conducting an oyster fishing enterprise. We agree. After reviewing both the plaintiff's evidence and the trial court's reasons for judgment, it is apparent that the lower court improperly *1123 awarded lost profits based upon gross profit projections alone.
The reasons for judgment indicate that the trial court accepted the figure of 100 sacks per acre as the yield from the leases and valuated the harvests at $8.00 per sack in 1981 and $10.00 per sack in 1982-1984. The court then calculated the plaintiffs' damages by multiplying those figures by the plaintiffs' lease acreage. The trial court gave no indication, however, of deducting costs and expenses from those gross profits projections. When those factors are combined with the evidence in the record which shows plaintiffs made no attempt, and in fact hindered defendants' attempts, to prove the production costs associated with oyster fishing, it is apparent that the calculation of plaintiffs' damages is improper due to its failure to reflect the costs involved in producing the oysters for market.
In Louisiana, damages awarded for negligent damage to oyster leases is the market value of the oysters which would have been harvested less the expenses of producing those oysters for market. Lauzon v. J.C. Trahan Drilling Contractor, Inc., 247 So.2d 236, 241 (La.App. 4th Cir.1971), writ den., 259 La. 69, 249 So.2d 206 (1971); Skansi v. Signal Petroleum, 375 So.2d 965, 969 (La.App. 4th Cir.1979); Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173, 180 (La.App. 4th Cir.1973). Due to such activities as planting seed oysters, harvesting, and cleaning the reefs of the remaining unharvested oysters, plaintiffs would have accrued considerable operating costs from crew salaries or captain's shares, fuel, equipment maintenance, and galley expenses. See Captain Kevin Corp. v. Bay Drilling Corp., 380 So.2d 639 (La.App. 1st Cir.1979); Skansi v. Signal Petroleum, 375 So.2d at 965 [operating costs and depreciation of equipment]. Thus, as a matter of law, the trial court erred when it failed to deduct production costs when calculating the quantum of plaintiffs' damages for lost profits.
2. Lost Profits for a Decade
Defendants also object to the time span of the award, claiming it was error to award plaintiffs lost profits for a decade, as the established rule is oyster lessees are entitled to recover lost profit damages for the year following the occurrence and are allowed, only occasionally, to recover continuing damages for an additional year. Despite this rule, the trial court awarded damages for lost profits for ten years because defendants did not mitigate their own damages by repairing the water bottom during the six years following the occurrence and because Dr. Cake testified that, after the oyster reefs were repaired, it would be an additional three years before the leases would be ready for commercial harvest. In making this ten year lost profit award, the trial court erred. The law permits recovery of only non-speculative lost profits which, in this case, does not extend beyond two years.
Numerous variables must be considered in oyster production cases such as whether the fisherman has a buyer, the harvest is prohibited or hindered due to pollution, the oysters are lost because of natural predators, and/or the oyster lessee decides to rotate his leases or merely not fish his leases. Consequently, when assessing awards in damaged oyster lease cases, courts have customarily found damage estimates spanning more than a year too speculative. Lauzon v. J.C. Trahan Drilling Contractor, Inc., 247 So.2d 236 (La.App. 4th Cir.1971), writ den., 259 La. 69, 249 So.2d 206 (1971); Voisin v. Berry Bros., Inc., 387 So.2d 633 (La.App. 1st Cir.1980). Even in general tort cases, lost income resulting from property loss is traditionally allowed only for a reasonable time, and then, only when not based upon conjecture. Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d 387 (La.App. 2d Cir.1987), writ den., 513 So.2d 827 (La.1987).
The nature of plaintiffs' loss precludes an award for ten years of profits; recovery is allowed only for the time reasonably necessary for the property to be replaced. Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d at 407 [the absence of funds with which to replace damaged or destroyed property cannot be used to extend beyond a reasonable time, the time that the property *1124 otherwise should have been replaced]; Louisiana Farm Bureau Mut. Ins. Co. v. Dunn, 484 So.2d 853 (La.App. 1st Cir.1986) [One cannot recover against a tortfeasor for a loss beyond the time which should have been reasonably necessary to replace the property]. Moreover, contrary to the trial court's pronouncement, the doctrine of mitigation of damages requires the injured party to mitigate their own tort damages. Altazan v. Ponchartrain Dredging Corp., on rehearing, 385 So.2d 292, 293 (La.App. 1st Cir.1980); Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d at 407. It was not defendants' duty, but plaintiffs' duty to mitigate their damages. Their failure to do so does not inure to their benefit by creating an increased damage award.
Therefore, because the law permits recovery of only non-speculative lost profits for the time reasonably necessary to restore the property, the plaintiffs' award of lost profits is reduced from ten years to two years of lost profits, the highest point reasonably within the discretion afforded the trial court. See Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977).
3. Extent of the Damage Sustained by the Oyster Leases
The underwriters also assert it was error for the trial court to award damages based upon the premise that the vessels rendered the whole of plaintiffs' leases, and all of Bay Lanaux, unsuitable for oyster production because the evidence established that only portions of the leases were damaged and that the leases continued and presently continue to support oyster cultures. We agree.
When the M/V John XXIII crossed Bay Lanaux from its northwestern tip to its southeastern end, she gouged the water bottom and pushed mud to the side, forming a spoil bank. Her track was 120 to 256 feet wide, averaging 180 feet across and approximately one to two feet into the bottom. The disturbed area, as measured by the two surveys completed within a few months of the crossing, was determined to be either 61.4 acres by defendants' surveyor or 116.3 acres by plaintiffs' surveyor. Nevertheless, the trial court determined that the whole of plaintiffs' oyster cultures (378 acres) were killed by the deposit of water bottom sediments on the oysters. And "[a]lmost the entire ability of the Bay to produce oysters has been destroyed ..." The basis for these findings were Dr. Cake's 1) speculations as to the potential for sedimentation to have spread throughout the bay; 2) testimony regarding blackened oysters found in his dredging samples taken five years after the M/V John XXIII's crossing, and 3) testimony that five years after the crossing he found a millimeter to an inch of silt in portions of the bay. Our review of the record, however, convinces us that the evidence does not support the trial court's findings as to the extent of plaintiffs' damages.
Michael Rayle, Jr., of Steimle and Associates, was accepted as an expert in acquatic biology and biological science and testified about his two day survey of the Bay Lanaux area on October 23-24, 1980. He testified that he and Dr. Maureen Mulino, another biologist at Steimle, were hired by 3-A's Towing to track the course of the M/V John XXIII. By using a fathometer[18], a sounding pole, map, compass and rangematic mark v range finder, they determined the track of the M/V John XXIII was 120 to 256 feet wide, averaging 180 feet across and approximately one to two feet into the bottom.[19] Their conclusion was that 61.4 acres of plaintiffs' leases were damaged as a result of the crossing and stranding of the M/V John XXIII.
Robert Ancelet, tendered by plaintiffs as an expert in Marine Biology, particularly in the field of oyster growth and oyster damage, calculated 116.3 acres of plaintiffs' leases were damaged. Ancelet, who is employed *1125 by the Louisiana Department of Wildlife and Fisheries, visited the Bay Lanaux area on November 7, 1980, at the plaintiffs' request. Using a fathometer and a compass, but not a sounding pole, he calculated 116.3 acres were damaged and that the path of the M/V John XXIII passed through the middle of the bay.[20] At the conclusion of his half-day investigation, he felt he had made reasonable estimates as to the extent of the damages plaintiffs' leases sustained.
Ancelet returned to the bay area a few weeks later, on November 20th, to take mortality samples. Using Tesvich's boat, he took 24 oyster samples; half were pulled from the area that he found damaged while the other half were pulled from areas he presumed were undamaged. His test results found three to forty percent mortality in the areas he presumed were undamaged and ten to ninety-six percent mortality in the areas he presumed were damaged.
Ancelet's calculations tracked the path of the M/V John XXIII as having passed through the center of the bay. The Steimle & Associates biologists, on the other hand, had tracked the M/V John XXIII as having traveled along the western shoreline, almost following the shore. The Steimle tracking then showed the vessel as traveling through a choke point, and on towards Tesvich's lease No. 20651. The reason for the apparent disparity in the findings of the experts, may be explained by the difference in their scientific methodology as illustrated by the following excerpt taken from Rayle's trial testimony:
Mr. Coleman:
(Defendants' Counsel)
Q All right, sir. Could you tell me what your findings were in reviewing [Mr. Ancelet's] report concerning this incident.
Mr. Rayle:
A Mr. Anselot [sic] apparently was not poling while he was running his Fathometer across the bay on his transects because for one reason he makes no mention of it in his report that he did any poling. I was in court when he was testifying yesterday and again he made no mention of using poling information to supplement what his Fathometer was showing him andâ 
Q What is the significance of that?
A Like I described previously that there are certain features that you may haveâ you may have certain features, natural features of the bottom that can mimic things that you would expect to see in a man-induced bottom disturbance. I again make an example of sometimes a raised reef area will come up and there will be a slight depression next to it and where you might think that this is an area of mud that has been pushed to the side because of a vessel passage. But, on investigation with a pole you will find out that it is hard shell and there is no sediment overburden and there is no soft mud and so it was a natural feature at the bottom and not something caused by man.
Q I see.
A Because lacking that data we can't be sure that Mr. Anselot [sic] was actually seeing a disturbed bottom caused by and in this case, a vessel passage or some natural feature of the bottom. On some of the transects, Fathometer transects which he was kind enough to supply to us and they weren't included in his report but he was kind enough to supply that to us. There were certain features at the bottom which appeared to be natural features at the bottom which he was including in the area that he was marking as disturbed on his Fathometer transects in which he translated into the map that was attached to his report as a closure area showing the disturbed area across the bay. Other things that we noticed in the review of the report is specifically there are certain areas that he marked as damaged yet they don't have a Fathometer transect over them and I am not saying *1126 that it had to be the exact same place but there is none in the direct vicinity that he would be able to tell that that was a damaged area.
Q I see.
A In particular transects A to B and C to D and A to E and K to L and at 70 degrees and 5 degrees and O to P and end at 70 degrees and 5 degrees and O to P don't show the typical track that we found in our Fathometer transects of this particular vessel passage. We did find it on some of his other transects. Also transects A to G and F to J and end at 5 degrees and those in particular show what appear to be natural features of the bottom and they are included as the "disturbed area." Samples 1 and 2 of his oyster samples are included in the alleged damaged area but when you use the data from his report to plot the location of those samples they fall outside of the damaged area. On the other hand Sample 12 is included with his list of samples from the undamaged area but it is taken when you plot it and it falls in to what his map shows as the disturbed area.
Q Let me ask you this: As far as the location of the damaged area as he testified to or as he pointed out and as to your findings, can you tell very simply if there was a difference in the areas of the damagedâ 
A He put the track of the vessel on the wrong side of the bay.
Q All right, sir.
A He put it in the central and eastern side of the bay when actually for some reason the track of the vessel goes along the western shoreline and almost following the shoreline and then through a choke point in the bay and then towards Mr. Tesvich's Lease 20651.
(trial testimony, pp. 547-553; emphasis added)
In 1984-1985, plaintiffs brought in yet another expert, Dr. Edwin Cake, to investigate the status of their leases. Dr. Cake, an expert in the fields of Biological Oceanography, Estuarian Process and Oyster Biology, tested the present condition of the leases in 1985, nearly five years after the crossing and stranding of the M/V John XXIII. By his own admission, Dr. Cake did not conduct independent tests to determine the extent of the damaged acreage. Instead, when he prepared his report on the present status of six of the plaintiffs' seven leases and on the cost of reconstructing those leases, he utilized Ancelet's conclusion that 116.3 acres, inclusive of spoil bank, had been damaged by the pushboat.[21]
Dr. Cake's sounding pole and dredging tests, performed four years and eight months after the crossing incident, showed that the support base of the reef was below sediment. At trial, Dr. Cake testified that the water bottoms were either too soft or the shell material that had originally covered the bottom had been covered by sediment. As a result, spat could not attach to the shells during spat fall[22] and seed oysters could not be unloaded in the area, because they would just settle into the sediment. Consequently, he recommended that 50 cubic yards of clam shells per acre be placed on the damaged acreage to provide a new shell base. Dr. Cake's report also concluded that of the 2,000 oysters dredged for his samples, seventy-four percent were seed oysters, which indicated a large and successful spat fall in 1984.
At trial, Dr. Cake testified at length about sediment translocation. During direct examination, he hypothesized about *1127 sediments traveling outside the disturbed area, approximately 500 feet in all directions. On cross-examination, however, he admitted that he took neither coring samples nor current samples. He also admitted that he made no findings as to the amount of sediment placed into suspension as a result of the crossing of the M/V John XXIII on September 25, 1980, and he did not know how far the sediments moved in this particular case because he had not taken any measurements. He also admitted that his sole evidence of siltation/sedimentation amounted to the number of blackened oysters found in his dredging samples taken June 2, 1985.
Oysters are blackened as a result of anaerobic and sulfide-reducing conditions which alter the oyster's shell coloration without affecting its marketability. Dr. Cake found these blackened oysters to be "three times more abundant at sampling stations" within the areas Ancelet determined were disturbed, as compared to the oysters from stations in the areas Ancelet found undisturbed. His samples revealed the following number of blackened oysters:

Lease and No. of No. of
sample oysters blackened oysters
21239-1 117 0
21239-2 161 13
21239-3 123 15
21239-4 104 27
21249-1 168 23
22533-1 152 47
23853-1 89 89
23853-2 128 3
20651-1 37 37
20651-2 78 12
20651-3 513 116
22546-1 154 0
22546-2 134 46

No evidence, however, was introduced to establish that the number of blackened oysters found by Dr. Cake were in an abnormally high quantity or percentage or were a direct result of the passage of the M/V John XXIII five years before.
To give perspective to plaintiffs' evidence on blackened oysters and to show that the presence of blackened oysters does not create a prima facie case of sedimentation or a damaged oyster lease, Mr. Rayle testified that the mere presence of a blackened shell without other evidence, such as a buried shell, does not by itself indicate a damaged oyster.[23] He stressed that the indication of a blackened shell had to be used in conjunction with other information, as the presence of "blackened shell by itself with no other information doesn't prove a particular impact to a lease".
During defendants' presentation of evidence, Rayle also testified that during his two day survey he found the disturbed area contained soft mud over shell in both the gouge created by the push boat and in its adjacent areas. He determined lease No. 20651, the site of the stranding, had approximately fifteen acres of disturbed area, with mud lumps sticking out of the water in the vicinity of where the push boat had supposedly grounded. He also testified that Steimle's survey determined that the number of acres damaged were 27.6 acres on lease No. 21239; 0 acres on No. 21249; 5.4 acres on No. 22533; 5.1 acres on No. 22630; 2.1 acres on No. 23853; 15.1 acres on No. 20651; and 6.2 acres on No. 22546.
Rayle also testified that he and Mulino conducted a non-exhaustive quantitative sample survey of the plaintiffs' oyster cultures. On lease No. 20651, they found almost 100% mortality, as the oysters were blackened and buried. Their attempt to take samples from lease Nos. 23853 and *1128 21239, which were away from the vessel's track, was virtually futile because the researchers were unable to bite into the reef with their hand-held dredge. Consequently, they gathered only a few oysters from those leases, but none with sediment covering them. Likewise, on lease No. 22546, they found live oysters, without sediment.
Near the close of the underwriters' presentation of their defense, the following statement was made during the colloquy that occurred between defense counsel and the court:

* * * * * *
THE COURT:
I understand that. And I also understand that this witness [Mr. Rayle] has testified that certain areas of the lease were not disturbed. I think the contents of both of [Dr. Cake's and Mr. Rayle's] testimony is to the effect that there were some areas that were not disturbed and I don't think anybody is contending that the entire reefs were disturbed or gouged or covered with sediment.
(tr. transcript, pp. 573-574.)
In light of the foregoing evidence, it was gross error for the trial court to adopt as its findings Dr. Cake's speculative remarks on the potential of sedimentation and to render a judgment based upon such conjectural evidence. Other than Dr. Cake's hypotheses on the potential of sedimentation, no evidence or expert testimony suggested that the entire 378 acres of plaintiffs' leases had been damaged or destroyed as a result of the passage of the M/V John XXIII. Instead, the evidence showed Dr. Cake had unquestioningly adopted Ancelet's findings that 116.3 acres were damaged and Dr. Cake's oyster samples indicated that plaintiffs' had a thriving oyster population in June of 1985. Thus, the only evidence of fact presented to the trial court from which it could make its determination was the Steimle report that 61.4 lease acres were damaged and the Ancelet report that 116.3 acres were damaged.
As there is no evidence in the record supporting the determination that the entire 378 acres of oyster leases sustained damage, the trial court's finding must be lowered to the highest figure that could reasonably have been found from the evidence. See Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977). Accordingly, although we find the Steimle report the more accurate of the two reports, it was reasonably within the trial court's discretion to conclude that Ancelet's estimate of 116.3 acres was the number of acres damaged. Due to the overwhelming evidence that lease No. 20651 sustained greater damage than the other leases, it was also within the trial court's discretion to adopt the Steimle findings, as to that lease alone, and to find a total of 15.1 acres of lease No. 20651 damaged, rather than the 10.68 acres determined damaged by the Ancelet report.
4. Reconstruction Costs
Defendants' next assertion is that the trial court erred by awarding plaintiffs reconstruction costs, claiming the award is without a legal basis. In the alternative, defendants claim the award is improper because the cost of reconstruction exceeds the fair market value of the property. We disagree with both of these assertions.
When assessing damages, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the damage. LSA-C.C. art. 2315; Coleman v. Victor, 326 So.2d 344, 346 (La.1976). One type of damages is the cost of restoring the property to its former condition, Coleman v. Victor, 326 So.2d at 347, to place the injured party in the same position he was in prior to the accident. See Lemon v. Fein, 467 So.2d 548, 554 (La.App. 4th Cir.1985), writ den., 472 So.2d 594 (La.1985); See also La. Farm Bureau Mutual Ins. Co. v. Dunn, 484 So.2d 853, 856 (La.App. 1st Cir.1986). Consequently, in damaged oyster lease cases the cost of restoring the property is recognized as a recoverable item of damages. Skansi v. Signal Petroleum, 375 So.2d 965, 967 (La.App. 4th Cir.1979).
Dr. Cake recommended that for the areas without shells, 50 cubic yards of shells per acre were needed to provide a new shell *1129 base. The agent from Pontchartrain Material Corporation also testified that, in accordance with the guidelines set by the Louisiana Department of Wildlife and Fisheries, they also recommended 50 cubic yards of shells per acre and quoted plaintiffs the price of $16.59 a cubic yard in place. Their December 11, 1985 letter to plaintiffs' counsel stated that for the quoted price, approximately 5800 cubic yards of clam shells would be delivered and unloaded by high pressure water jets at Bay Lanaux and Grand Bayou in back of Port Sulphur. Pontchartrain Materials concluded that the cost of repairing plaintiffs' damaged acreage would be $96,470.85.[24]
The underwriters argue that even if the oyster lessees are entitled to reconstruction costs, because the cost of reconstructing the leases exceeds their fair market value, that item of damages is not recoverable. In support of this argument, the underwriters assert the fair market value of the leases is the purchase price of Tesvich's leases, approximately $219.30 per acre, whereas the cost of reconstructing the leases is $829.50 per acre.[25] We are not persuaded, however, by defendants' arguments.
Although there are instances in which repair costs sofar outweigh the value of the thing damaged that an award of repair costs would be unreasonable, this is not such a case. In comparison to the utility of the property in its repaired state, the cost of repairing the oyster leases is de minimis. Even though reconstruction costs are arguably four times greater than the value of the damaged acreage[26], $96,470.85 is not prohibitive. The damaged object is nondiscardable real property; it would be unreasonable to fail to restore the water bottoms to their prior income producing capacity.
Accordingly, we find the trial court did not clearly err or abuse its discretion by awarding reconstruction costs as a measure of plaintiffs' damages. The trial court's award, however, is amended to accord with our determination of the number of acres actually damaged.
5. The Sufficiency of the Proof of the Plaintiffs' Individual Awards
In proportion to their lease acreage, the trial court awarded plaintiffs damages for lost gross revenues for ten years and for the cost of reconstructing 378 acres of water bottoms. The final award was in favor of Sinajka and Beatice Farac for $1,791,368.00; M.J. Farac, Jr., for $684,622.50; Beatrice Farac for $1,502,910.50; and Kuzma Tesvich for $745,700.00. To accord with our previous findings, however, this award must be reduced to reflect our conclusion that only 120.73 acres, Ancelet's estimate of 116.3 acres plus the differential of 4.42 acres for lease No. 50261, were damaged. And reduced to reflect that plaintiffs are entitled to recover no more than two years lost net profits.
Now that we have determined the perimeter of the damages that plaintiffs may recover for their alleged lost profits, we turn to the issue of the amount of damages plaintiffs are entitled to recover based upon the adequacy of their proof.
In a suit for damages, the plaintiff carries the burden of proving the damages suffered as a result of the defendant's fault. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081, 1092 (La.1983), on rehearing. To support a damage award there must be evidence in the record. Borden, Inc. v. Howard Trucking Co., 454 So.2d at 1092. Moreover, a claim for lost profits will not be supported by mere estimates of loss. F & F Transfer, Inc. v. Tardo, 425 So.2d 874, 876 (La.App. 4th Cir.1983). This is especially true in cases where corroborative evidence is shown to be available, yet is not produced.
*1130 F & F Transfer, Inc. v. Tardo, 425 So.2d at 876; See Lavigne v. J. Hofert Co., 431 So.2d 74, 76 (La.App. 1st Cir.1983) [one accepted method of proving lost profits is by calculating profits from similar activities during other periods of time and using such calculations as a basis for estimating lost profits for the period in question].
Additionally, damages for lost profits resulting from an offense or quasi offense must be proved to a reasonable certainty; such damages will not be allowed where the lost profits are purely conjectural. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d at 1092; Rosenblath v. Louisiana Bank & Trust Co., 432 So.2d 285, 290 (La.App. 2d Cir.1983) F & F Transfer, Inc. v. Tardo, 425 So.2d 874 (La.App. 4th Cir.1982); C & V Gravel, Inc. v. Maco Const. Corp., 465 So.2d 938, 974 (La.App. 2d Cir.1985) [A loss of business profits resulting from an offense or quasi offense are special damages which in many cases are not susceptible of proof to a mathematical or legal certainty. However, even in such cases, lost profits must be proved with reasonable certainty; the award cannot be based on speculation and conjecture.]. A claim based solely on the testimony of the injured party, unsubstantiated by other evidence, does not constitute a reasonable certainty. Louisiana Joint Underwriters of Audubon Ins. Co. v. Gant, 439 So.2d 1153, 1157 (La.App. 4th Cir.1983), writ den., 443 So.2d 589 (La.1983) [the court gave plaintiff the opportunity to produce records to support her claims, yet she failed to do so. Accordingly, the trial court properly denied plaintiff any award for lost income not covered by insurance]. The trier of fact must have some reasonable basis for its award. Consequently, where the record contains no factual basis for the lost profit award or the amount so awarded, the appellate court must reverse or amend the award to conform to the evidence. Rosenblath v. Louisiana Bank & Trust Co., 432 So.2d 285, 290 (La.App. 2d Cir.1983).
The type of quantitative and qualitative proof of lost profits that has become standard in damaged oyster lease cases is illustrated by Captain Kevin Corp. v. Bay Drilling Corp., 380 So.2d 639 (La.App. 1st Cir.1979) and Skansi v. Signal Petroleum, 375 So.2d 965 (La.App. 4th Cir.1979), rehearing den. Captain Kevin Corp., involved oyster lessees that brought suit against a co-existing mineral lessee and its drilling contractor, after the oyster lessees were forced to cease their harvesting due to oil contamination. Until May 24, 1986 the oyster lessee harvested and sold their oysters without encountering any oil contamination problems. However, after defendants began drilling an oil well on April 4, 1976, at the northwest end of plaintiffs' leases, defendants injected the well with 90, 650 and 210 barrels of diesel and/or black majic on May 6th, 7th, and 14th, respectively. As a result, plaintiffs' oysters acquired an oily taste and became unmarketable.
The First Circuit affirmed the trial court's award to plaintiffs in the amount of $106,000.00, finding the trial court's methodology for calculating the award reasonable and finding that neither the estimates of the quantity of oysters planted nor the estimates of the amount of oysters that remained unharvested were purely speculative. The appellate court also noted that all these items were supported by the evidence.
In order to determine the amount of lost profits plaintiffs were entitled to recover, the trial court had taken the number of sacks of oysters planted and subtracted the number of sacks harvested, to arrive at the number of sacks of oysters that remained to be harvested. To that figure, the court calculated in a 10% growth factor and added a 25% natural attrition rate because of predators and the physical inability to recover 100% of the oysters planted. Then the trial court subtracted the cost of harvesting the remaining oysters at $1.00 a sack, to arrive at plaintiffs' net loss. To that figure, the trial court added the cost to clean the reefs of the unharvested oysters. The appellate court noted that all these items were supported by the evidence.
In Skansi v. Signal Petroleum Co., 375 So.2d 965 (La.App. 4th Cir.1979), rehearing den., Justice Lemmon, then a judge on this Court, authored another opinion which considered *1131 the measure of damages to be awarded an oyster lessee for the lost use of his leases due to petroleum pollution. In Note 3, 375 So.2d at 968, the court indicated that a critical factor in assessing lost profits from damaged oyster leases is how much of the overall operation of the oyster business is limited by the plaintiffs' own labor. If the overall operation consisted almost entirely of plaintiffs' own labor, and if he had other leased property available on which to conduct the operation, then arguably his loss was the difference in production ability between the damaged property and the other leased property on which he substituted his labor. However, as the Skansi plaintiff's operation consisted to a substantial degree of investment of capital and employment of the labor of others in addition to the plaintiff's own labor, the question of whether the damaged property and other leased property could have been put into production at the same time could not be determined solely by the limits of plaintiff's own labor. 375 So.2d at 968, n. 3. As a consequence, in reaching its determination of the reasonable net value of the plaintiffs' lost production, the court considered plaintiffs' production records of past harvesting and reseedings, the number of sacks of seed oysters planted the previous year and the number of sacks left unharvested from the previous year. The court then considered the return ratio of the number of oysters harvested for each sack of seed oysters planted for a six year period, which the court then determined was a consistent 1.1:1.
On that basis, the court concluded the reasonable estimate of the size of plaintiff's one-year oyster crop was 4,730 sacks. After determining the 1974 price of oysters was $6.25 per sack and plaintiff's operating costs and depreciation of equipment "for the last calendar year of complete harvesting and seeding, prior to the oil spills amounted to $2.16 per sack", plaintiff's damages were assessed at $19,350.00. 375 So.2d at 969. See also Lauzon v. J.C. Trahan Drilling Contractor, Inc., 247 So.2d 236 (La.App. 4th Cir.1971), writ den., 259 La. 69, 249 So.2d 206 (La.1971); Skansi v. Humble Oil & Refining Co., 176 So.2d 236 (La. 4th Cir.1965).
With the foregoing standards of evidence and illustrations in mind, we turn to the underwriter's contention that the trial court's award for lost profits is purely speculative and unsupported by competent evidence.
a. The Farac's Evidence
The underwriters claim M.J. Farac's uncorroborated and contradictory estimates of the number of oysters he planted and harvested from the Faracs' Bay Lanaux leases and his vague descriptions of the expenses he incurred, do not serve as a proper basis for calculating lost profits. Additionally, the underwriters claim that because the Faracs failed to produce the evidence which was available to them, showing their production levels and costs, they failed to sustain their burden of proof. We agree with both of these assertions.
Scrutinizing M.J. Farac, Jr.'s testimony, as he testified on behalf of all the Farac plaintiffs, we find he testified that in 1979 he worked the pass of lease No. 21239 and the entirety of lease No. 23853. He also testified that he worked lease No. 22630 and portions of lease Nos. 21239 and 22533 in 1978. He claimed that sixty percent of the 25,000 sacks of oysters he harvested during 1978-1979 might have come from the Bay Lanaux leases. On cross-examination, he also testified that he could prove that the harvest estimates of the expert witnesses of 100 sacks of oysters per acre were incorrect because he had bedded 1,000 sacks of spat and seed oysters per acre. He did not, however, specify whether these labors were performed on his leases in Bay Lanaux. He also admitted he had expenses for bedding the seed oysters and harvesting and unloading them at the dock, but he did not provide specific information about his expenses.
On cross-examination he testified he could produce records that substantiated his testimony and his claims because he could produce "every ticket from every dealer for oysters sold from that [the Bay Lanaux] area, and the dates loaded on the *1132 trucks and the tickets sold by the dealers... with no problem." He also testified that he had records to show how many sacks of oysters were obtained from state grounds and, from his payroll records, the number of sacks that were planted on the Bay Lanaux leases.
This line of questioning prompted objections of relevancy from Farac's counsel. The trial court appeared to admit the questions were indeed relevant, but then began interrogating defense counsel as to whether he had subpoenaed these business records. When defense counsel replied in the negative and attempted to point out that it was plaintiffs' burden to introduce this evidence, the trial court terminated defense counsel's line of questioning. The discussion that occurred between the court and counsel pertained to plaintiffs' burden for establishing their case:
MR. RAGUSA:
Excuse me. I am going to have to enter an objection at this time. My objection goes towards the relevancy of this particular line of questioning. And I fail to see the relevancy, Your Honor, because apparently counsel is trying to bring forth some records as to what was produced from these leases, if, in fact, the witness testified to that. And I fail to see the relevancy in this regard, Your Honor: What was produced in the past from these leases has no relevancy or bearing whatsoever as to determine what he, in fact, had there, and what would be lost in the future. Because as we well know, Your Honor, and I believe that witnesses have testified to this fact, that it is up to that particular oysterman when he will harvest, when he will cultivate and there is no bearing as to what is actually there. And the only thing income can show, Your Honor, is what he, in fact, determined or decided to cultivate at any particular time.

MR. COLEMAN:
I think it has relevancy in seeing how much he harvested from these leases prior to that incident. And he has accessâ 
THE COURT:
I will agree to you, but I think all of your questions will come to naught. You are asking him if he has the records. Have you supoenaed the records?
MR. COLEMAN:
I have not subpoenaed them.
THE COURT:
All right. Terminate your questions with respect to this. You have had every opportunity in the world to subpoena the records. You have a deposition before you that you took three or four years ago, and if you haven't subpoenaed the records, you cannot get this witness to testify or to bring in records into the Court at this time.
MR. COLEMAN:
I am just asking him if he has access to such records.
THE COURT:
What is the purpose of it?
MR. COLEMAN:

If he has access to such records, he can show us what he his actualâ 
THE COURT:
Well, you had access to the records. That is what I am saying. Why didn't you get him to produce the records?
MR. COLEMAN:
Well, Your Honor, I think the burden is on Mr. Farac and the plaintiffs in this case to establish whatâ 
THE COURT:
He told you what he has produced. Now, you are either going to take that, or you should have produced his records. You should have had him produce his records, I should say.
MR. COLEMAN:
Again, Your Honor, I think it is incumbent upon the plaintiffs to establish their case and to put on the records to show exactly what theirâ 
THE COURT:
The Court is not going to allow any further questions with respect to what records he has access to which have not been produced today or prior to today.

*1133 (Tr. transcript, pp. 405-410; emphasis added)
During the underwriters' presentation of their defense, defense counsel once again attempted to show that it was within Farac's power to produce evidence relevant to this claim of lost profits:
DIRECT EXAMINATION BY MR. COLEMAN:
Q Interrogatory No. 24 reads: "With regard to the five years preceding September 25, 1980 until the present time, please state the amount of taxable income you realized as a result of the operation and use of Lease Nos. 21239, 21249, 22533, 22630 and 23853?" And the interrogatory continues: "Please state the years referred to whether for both State and Federal income tax returns you reported income from the leases separately from your other operations and if so, please state the amount so reported." And the answersâ 
MR. RAGUSA:
Your Honor, before he continues, I am going to enter an objection as to the relevancy and materiality. Income for prior years has no bearing, even if it was from these leases, Your Honor. Again, Your Honor, that goes to my previous objections in this matter. And what Mr. Farac realized from these particular leases in prior years and if he realized zero, Your Honor, it has no bearing on this case. This is a capital investment, this is a crop and this is something that hasâ well, if he took out half of the oysters or what, it has no bearing on this case, Your Honor, as to what his income was realized from these particular leases.
THE COURT:
The Court is going to allow the question.
DIRECT EXAMINATION BY MR. COLEMAN:
Q And in the answer to interrogatory No. 24 on "D-16B," it has, "M.J. Farac, Jr. 1978: $7,199.00; 1979: $36,814.00; 1980: $7,755.34 (loss)" are those your answers to these interrogatories, sir?
M.J. FARAC, JR.:
I imagine so.

* * * * * *
MR. COLEMAN:
... Your Honor, I would also like to call, unless Counsel will stipulate that Mrs. Beatrice Farac would testify that these are her answers.
MR. RAGUSA:
I will stipulate to that, Your Honor.
MR. COLEMAN:
That these are her answers to those interrogatories also?
MR. RAGUSA:
I will stipulate to that.
(trial transcript, pp. 633-637; emphasis added)
Our independent review of the record shows that despite the realities of their oyster operation, the Faracs made every attempt to convey to the trier of fact the incorrect premise that their lost profit damages should be calculated as if all 318 acres of their Bay Lanaux leases were harvested annually at full production capacity and without costs.
When pressed, however, Farac admitted that he rotated his 5,000 acres. He also admitted that he had harvested portions of the 318 acres in 1978 and 1979 and that it was his practice to allow his leases to lie fallow for at least three or four years after being harvested. Such evidence tends to show that the Faracs would not have harvested all of the Bay Lanaux acreage in any one year, much less in both the 1980-1981 and the 1981-1982 harvest seasons.
Next, despite the expenses of producing the oysters for market being a critical element of the plaintiffs' proving their claim of lost profits, Lauzon v. J.C. Trahan Drilling Contractors, Inc., 247 So.2d 236, 241 (La.App. 4th Cir.1971), writ den., 259 La. 69, 249 So.2d 206 (1971); Skansi v. Signal Petroleum, 375 So.2d 965, 969 (La. App. 4th Cir.1979), rehearing den.; Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173, 180 (La.App. 4th Cir.1973), the Faracs failed to introduce any evidence of their costs. Particularly, Farac failed to *1134 introduce any evidence of the production and costs of his harvesting the portions of Bay Lanaux leases in 1978 and 1979, even when he admitted it was within his power to procure this evidence. This factor alone should have prevented the Faracs from recovering lost profits, as lost profits are precluded where corroborative evidence is shown to be available but is not produced. F & F Transfer, Inc. v. Tardo, 425 So.2d at 876. To compound Farac's failure to produce the corroborative evidence that he recognized was available to him, Farac's testimony as to his planting and harvesting also failed to provide even a minimal degree of detail or specificity. F & F. Transfer, Inc. v. Tardo, 425 So.2d at 877 ["although the absence of independent corroborative evidence is not always fatal, the lack of even a minimal degree of detail and specificity in the plaintiffs' testimony, regarding the issue of lost profits, would preclude recovery of this type of damages"]. Thus, the trier of fact clearly abused its discretion in making the Faracs' award for lost profits. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d at 1092.
Our conclusion, however, does not imply that the Faracs are not entitled to other forms of damages. To the contrary, we recognize that the Faracs lost the use of their income producing property as a direct result of the negligent actions of the M/V John XXIII. Consequently, to recompense for the loss of its use, they are entitled to reasonable damages of $50.00 per year for the 100.27 acres of their 318 acres that sustained damages, totalling $10,027.00, for the two year period following the M/V John XXIII's mishap.
b. Tesvich's Evidence
Proof of Tesvich's lost profits involves different considerations than those presented by the Faracs' evidence. Because Tesvich had never harvested his leases, the underwriters contend that awarding him lost profits amounts to gross speculation. They also claim that because Tesvich's income tax returns indicate he earned $10,209.00 in 1979, $15,595.00 in 1980, and $23,759.00 in 1981, he failed to prove his lost profits. The underwriters make additional arguments about the trial court's error in relying upon Dr. Cake's theoretical and speculative calculations of Tesvich's damages. For the reasons cited below, however, we find Tesvich is entitled to recover damages for lost profits from and/or for the lost use of his leases, but we must adjust his award to reflect only those damages that he proved.
Tesvich, who had never commercially harvested his Bay Lanaux leases, testified that he had planted approximately 25 to 30 loads of oysters on his Bay Lanaux leases prior to the M/V John XXIII incident. Planting the oysters involved the labors of Tesvich and one deckhand, who was paid $80.00 a day. Other than the salary of his deckhand, he had no idea as to his other expenses for the leases. He testified that depending upon how plentiful the seed oysters were, it took approximately two days to transplant a load of oysters from the State's wild reefs to his own leases.
Prior to the M/V John XXIII's incident, he had never harvested from his own leases because oysters were more plentiful on the State's wild reefs. But, he claimed he probably would have harvested his own leases in March of 1981 when the State's reefs closed. Due to his previous plantings, he anticipated harvesting 5,000 to 6,000 sacks from the two leases. Nevertheless, it was Tesvich's practice to wait until he had orders from dealers before he harvested.
In Skanski v. Signal Petroleum, this circuit noted that a factor in assessing lost profits from damaged oyster leases is how much of the overall operation of the oyster business is limited by the plaintiff's own labor. 375 So.2d at 968, n. 3. Thus, where the overall operation of the business consists almost entirely of the plaintiff's own labor, like Tesvich's operation, and plaintiff worked other reefs, his lost profits are limited to the expenses actually expended, such as the cost of planting during the previous year, and to the production ability of the reefs' profits he actually worked as compared to the harvest that would have been realized from the reefs on the damaged leases.
*1135 As Tesvich could not have worked both his own reefs and the reefs that he had to use as an alternative to his own damaged reefs, his lost profits must reflect the limitations of his own labors. Tesvich is not entitled to better his position from the M/V John XXIII incident. Lemon v. Fein, 467 So.2d 548, 554 (La.App. 4th Cir.1985), writ den., 472 So.2d 594 (La.1985).
As Tesvich failed to introduce evidence of the lost profits he suffered from fishing reefs other than lease Nos. 20651 and 22546, we are constrained to limit his damages to reimbursement of crew costs, the only expense he proved to a reasonable certainty. Tesvich presented credible and uncontradicted evidence of planting 25 to 30 loads of seed oysters and Artigue presented credible evidence that, when he owned the leases, he had also planted 1 to 5 loads of oysters per year. Consequently, although the evidence does not indicate on which portions of the leases the oysters were planted, the totality of evidence convinces us that it is just to award crew costs for bedding a total of 30 loads of oysters.
Tesvich is, therefore, entitled to damages for the crew costs of himself and one deckhand, at $80.00 a day, for 30 loads of oysters, multiplied by two planting days per load (30 loads Ũ 2 days Ũ $80.00 Ũ 2 crew), totalling $9,600.00. Tesvich is also entitled to reasonable damages of $50.00 per acre, per year for the loss of use of his 20.36 acres during the two year period following the M/V John XXIII's crossing and stranding, totalling $2,036.00
F. Legal Interest
Defendants submit that the trial court's award of interest from date of judicial demand is improper due to the plaintiffs delaying the prosecution of this case and the damages not being ascertainable until trial. Legal interest in tort cases, however, is statutory. Interest attaches from the date of judicial demand. LSA-R.S. 13:4203; Burton v. Foret, 498 So.2d 706, 712-713 (La.1986); Plauche v. Consolidated Companies, Inc., 235 La. 692, 105 So.2d 269 (1958); Vallee v. Hyatt Corp., 433 So.2d 1070 (La.App. 4th Cir.1983); Auger v. Auger, 434 So.2d 492 (La.App. 2d Cir.1983). Accordingly, we affirm the trial court's award of legal interest, running from date of judicial demand.
G. Dr. Cake's Witness Fee
Defendants' final specification asserts the trial court erred in setting the amount of Dr. Cake's expert witness fees at $3,000.00. Their objection to the amount of the fee emanates from its being set in favor of Dr. Cake whose testimony defendants' claim was erroneous and/or based upon speculation and from it being six times the amount awarded to the other expert witnesses who testified at trial. Nevertheless, despite the disparity between the quantum of Dr. Cake's fee and the other experts' fees, we cannot conclude that setting Dr. Cake's fee at $3,000.00 was an abuse of the trial court's much discretion.
Fixing compensation of expert witnesses is, by statute, the right of the trial judge, LSA-R.S. 13:3666. To alter an award of expert witness fees, an appellate court must find that the trial judge abused the great discretion accorded to him in such matters. Wetzka v. Big Three Industries, Inc., 409 So.2d 393 (La.App. 4th Cir.1982); Coon v. Placid Oil Co., 493 So.2d 1236 (La.App. 3d Cir.1986), writ den., 497 So.2d 1002 (La.1986). Thus, even though Dr. Cake's fee is considerably higher than the fees set for the other expert witnesses who testified at trial, based upon Dr. Cake's credentials and his preparation for trial, we cannot conclude the trial court abused its much discretion in fixing the fee. Oshinski v. Central Nat. Ins. Co. of Omaha, 432 So.2d 929 (La.App. 4th Cir.1983), writ den., 440 So.2d 148 (La.1983). Consequently, we affirm the trial court's award of expert witness fees.
For the reasons assigned, the judgment of the lower court is annulled and set aside insofar as it determined that the defendants were liable as a result of the rescue efforts of the M/V Nora Adams; the damages caused to each lease constituted a separate occurrence; the individual Lloyd's Plan underwriters are liable in solido; the *1136 plaintiffs are entitled to lost gross profits for ten years; and the Faracs proved their claim for lost profit damages. The lower court's judgment is modified to reflect the reduction of Tesvich's award of lost profits to $9,600.00 because Tesvich proved only his lost crew costs and to reflect the award of damages for lost use in favor of all plaintiffs of $1,594.00 to lease No. 21239; $765.00 to lease No. 21249; $1,020.00 to lease No. 22533; $558.00 to lease No. 22630; $6,090.00 to lease No. 23853; $1,510.00 to lease No. 20651; and $526.00 to lease No. 22546. The judgment is also modified to reflect the reduction of the award of reconstruction costs to $13,214.26 for lease No. 21239; $6,341.85 for lease No. 21249; $8,455.80 for lease No. 22533; $4,625.82 for lease No. 22630; $50,486.00 for lease No. 23853; $12,517.90 for lease No. 20651; and $4,360.54 for lease No. 22546. In all other respects, the judgment appealed is affirmed.
Accordingly, I believe the judgment of the trial court should be reversed in part; modified in part; and affirmed in part, in the manner and for the reasons described above.
NOTES
[1] Oyster lease No. 20651.
[2] Only $25,000.00 of that price was for the oyster leases.
[3] Tesvich testified that by shrimping during the summer months, he earns $3,000.00 to $4,000.00 a year.
[4] M.J. Farac, Jr., testified that in 1979 he worked the pass of lease No. 21239 and the entirety of lease No. 23853. In 1978, he worked lease No. 22630 and portions of Nos. 21239 and 22533. He claimed that 60% of the 25,000 sacks of oysters he harvested during 1978-79 might have come from the Bay Lanaux leases.
[5] M.J. Farac, Jr., did not specify, however, whether these estimated expenses ran per boat or fleet(s).
[6] This evidence was presented to the trial court during defendants' presentation of evidence, when defense counsel confronted M.J. Farac, Jr., with his response to interrogatory No. 24. When his objections were overruled, plaintiffs' counsel stipulated that Beatrice Farac's answer to interrogatory No. 24 is the same as M.J. Farac, Jr.'s response.
[7] Lease No. 22630 was not visited by Dr. Cake.
[8] Due to the large number of underwriters subscribing to Policy HP 0198A, making it impractical to bring all the subscribing underwriters before the court, John Hebert Barder was nominated to represent the underwriters' interests in this suit.
[9] The owner of the M/V John XXIII, the push boat which was grounded while under the operation of 3-A's Towing.
[10] The Halliburton Company owned barge D 412, which was under the sole control of the operators of the M/V John XXIII on September 25, 1981.
[11] Each policy also contained an endorsement titled "Occurrence (Bodily Injury and Property Damage)" which provides:

SUCH INSURANCE AS IS AFFORDED BY THE POLICY FOR BODILY INJURY LIABILITY AND FOR PROPERTY DAMAGE LIABILITY APPLY SUBJECT TO THE FOLLOWING PROVISIONS:
1. In Insuring Agreement I, the words "and caused by accident" are deleted.
2. The term "occurrence" is substituted for "accident" wherever else it apears,
3. Occurrence means either an accident or a continuous or repeated exposure to conditions which results during the policy period in injury to person or real or tangible property which is accidentally caused. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
[12] The barge floated; it was not grounded.
[13] 46 U.S.C.App. Section 183 provides in pertinent part:

The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.
[14] This holding obviates any discussions on the issues of privity and laches.
[15] Latham also testified as to the value of the M/V Nora Adams. However, due to our holding in Subpart A of the Merits section of this opinion, testimony pertaining to the value of that vessel is irrelevant.
[16] The trial court sustained plaintiffs' objection to the recalling of Harold Adams because Adams had not been sequestered following his first appearance on the stand.
[17] By Acts 1988, No. 190, effective July 1, 1988, LSA-R.S. 22:499 was amended and reenacted to read as follows:

§ 499. Individual Underwriter's Liability
No underwriter at a Lloyd's may limit his total liability in any way. All underwriters shall be liable on each insured risk.
[18] Rayle explained that a fathometer provides a picture of the bottom, a profile of the bay; it shows the depth of the bottom and any irregularities. While making the fathometer transect, Rayle and Mulino also used a sounding pole to verify what is viewed with the fathometer. Otherwise, natural reefs could have mimiced the features and contour of the area thought to have been disturbed by the M/V John XXIII.
[19] See Appendix I.
[20] See Appendix II.
[21] DIRECT EXAMINATION BY MR. HEBERT:

Q Dr. Cake, in your report and findings, did you determine or attempt to determine the area of disturbed or damaged oyster leases?
Dr. Cake:
A I did not. This was four years and eight months later. In conducting a survey like this, I have to depend on the facts of others, and in this case I used the Wildlife and Fisheries Report, a report by Mr. Robert Anselot [sic], to determine the damaged portion
Q And you accepted his findings as being accurate?
A I did.
(tr. transcript, p. 237)
[22] Dr. Cake testified that one to two millimeters of sediment prevent the attachment of spat.
[23] Mr. Coleman: Q Can those oysters that you say have been blackened, can they be consumed?

Mr. Rayle: A As long as the oyster can get free contact with the water and as long as the margin is exposed that he can cycle water through his gills and feed and do all of the things that a normal oyster can do, the fact that his shell is blackened doesn't have any impact on him. If you pull that oyster out of the water and say put the oyster on the deck of the boat and in about fifteen minutes to a half of an hour the blackened color will disappear because of the contact with the air. There are large deposits of oyster shells that are buried under the mud or under sediment in the northern Gulf of Mexico in coastal Louisiana and coastal Alabama and I'm sure in other places and in Louisiana you will also find blackened shell under exposed portions of reefs.
(Tr. transcript, pp. 563-564.)
[24] 116.3 Ũ 50 Ũ 16.59.
[25] Defendants claim that the purchase price of approximately $219.30 per acre should control as the fair market value of the leases. Under their theory, the reconstruction costs would be limited to $25,505.00.
[26] The certainty of the fair market value of the leases has not been established. The purchase price of Mr. Tesvich's 1978 lease assignment, without more, does not unequivocally establish the fair market value of the plaintiffs' leases.